**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JARETT THORNTON AND ARIELLE THORNTON<br><br>Plaintiffs,<br><br>vs.<br><br>LAIRD NOLLER AUTOMOTIVE, INC., MCCARTHY AUTO GROUP OF LAWRENCE, INC., ALLY BANK, ETHOS GROUP, INC. & LAIRD NOLLER FORD<br><br>Defendant. | **Case No.** ____________________ |

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIF AND JURY DEMAND**

COMES NOW, Plaintiffs, Jarett Thornton and Arielle Thornton ("Plaintiffs" or "the Thorntons"), and for their verified complaint at law for damages and in equity for injunctive relief, allege as follows as against Defendants, Laird Noller Automotive, Inc., Laird Noller Ford, Inc. (collectively, with Laird Noller Automotive, Inc., "Laird Noller"), Ally Bank, Ethos Group, Inc, and McCarthy Auto Group of Lawrence, Inc., *d.b.a.* McCarthy Hyundai of Lawrence ("McCarthy Auto" and, collectively with Laird, Ally Bank and Ethos Group, Inc,, the "Defendants").

All allegations are made upon information and belief unless otherwise stated. Plaintiffs expressly reserves his rights to amend this Complaint to add parties, allegations, and claims.

**PRELIMINARY STATEMENT**

1. Laird Noller, with the assistance of other third-party participants, is a RICO enterprise. Laird Noller does not make money selling cars. It makes money selling unwanted service plans that are required to be purchased as a prerequisite to purchasing vehicles, and it makes money using such plans to inflate the amount its customers finance to amounts far in excess of the vehicles' actual values.

2. It does so with the knowledge and involvement of the related Defendants. It is from these service plans, not the sale of vehicles, that Laird Noller makes money. It is being sued in the United States District Court for Kansas for its ongoing unlawful business practices, and the FTW sent a warning letter to Laird Noller in March 2026 to complain of the practices. The conduct here is perhaps more egregious. In the present instance, not only were Plaintiffs required to purchase unwanted add-ons, the purchases were done without their knowledge for purposes of engaging in credit fraud. Specifically, in order to increase the price of the vehicle Plaintiffs purchased from Laird Noller, and to do so in order to borrow much more than the vehicle was actually worth, Laird Noller and Ally Bank added $17,000 in undisclosed add-ons to the final paperwork. This allowed them to finance more $20,000 more than the vehicle was actually worth. Plaintiffs had no idea these add-ons were being purchased, and the subject add-ons were never installed on the vehicle.

3. Defendants orchestrated their unlawful scheme through forged documents. Plaintiffs signed documents that did not identify any add-ons (other than a maintenance package that was supposedly included for free); Laird Noller forged them after Plaintiffs had executed the actual documentation.

4. Defendants' conduct is reprehensible and must be immediately stopped.

5. Defendants provide the subject service plans through an illegal enterprise using seemingly legitimate store-fronts to conduct their unlawful conduct on an ongoing basis. A consumer such as Plaintiffs would be lured into the dealership by the promise of a stated price. However, they actually are there to purchase service packages and other add-ons, which are required, but not disclosed.

6. As the FTC has noted in its March 2026 warning letter (sent to Laird Noller a month before the subject dealership was sold to McCarthy), a copy of which is attached as Exhibit 1, the practice of requiring consumers to purchase warranty packages is deceptive and unlawful, along with other practices, including failing to post the actual price of vehicles.

7. Less than one month after the front was identified by the FTC, Defendants then effectuated the transfer of the subject dealership to McCarrthy. In addition to the specific practices at issue here, Laird Noller apparently also was engaging in other unlawful practices on an ongoing basis at other dealerships. The letter attached as Exhibit 1 is one of less than 100 that the FTC sent in March of this year.

8. Defendants must be punished to the fullest extent at law and equity, including injunctive relief stopping the offending conduct.

**THE PARTIES**

9. Plaintiffs are married adults who reside in Savannah, Missouri.

10. Defendant, McCarthy, is a Kansas corporation with its registered address at 675 N. Rawhide Olathe, KS 66061. It presently operates McCarthy Hyundai of Lawrence, which is located at 2829 Iowa St, Lawrence, KS 66047 (the "Dealership"). Upon information and belief, McCarthy purchased the Dealership in, or around, April 2026, and did so on account of the fraudulent and illegal practices at issue in this Action.

11. Defendant, Laird Noller Automotive, Inc., is a Kansas corporation with its principal office at 935 W. 23rd Street, Lawrence, KS 66046. Its registered agent is Abigal Fraley, and its registered address is 2245 SW Topeka Boulevard, Topeka, KS 66611. Laird owned and operated the Dealership when the events at issue occurred. Laird Noller Automotive, Inc. has and does operate several auto dealerships throughout Kansas.

12. Defendants, Laird Noller Ford, Inc., is a Kansas corporation with its principal place of business located in Topeka, KS. Its registered agent is Abigail Fraley, 2245 SW Topeka Blvd., Topeka, KS, 66611 (Laird Noller Automotive, Inc. and Laird Noller Ford, Inc. are referred to herein as "Laird Noller").

13. Laird Noller markets and advertises hundreds of used vehicles at any given time, and it did so for thousands of vehicles during the four-year statute of limitations period preceding

November 1, 2025. Laird does so using the mails and wires, and specifically by posting its used vehicles on its websites and cars.com. All of the submissions of listings constitute mail fraud, as they fail to disclose necessary add-ons, including required service packages. As such, when each listing is submitted using the wires, the act constitutes wire fraud.

14. Laird was one of less than 100 car dealerships to receive a warning letter earlier this year. It responded by selling the offending dealership to McCarthy.

15. Defendant, Ethos Group, Inc. is a Texas corporation with its principal place of business located in Irving, Texas. Its registered agent in Kansas is: CT Corp. Systems, 112 SW 7th Street, Suite 3C, Topeka, KS 66603.

16. Defendant, Ally Bank, is a Utah corporation with its principal place of business located in Sandy, Utah. Ally Bank's Kansas agent for service is: CT Corporation System, 112 SW 7th Street, Suite 3C Topeka, KS 66603.

## VENUE & JURISDICTION

17. This Court has subject matter jurisdiction pursuant to Article V, § 14 of the Missouri Constitution and RSMo. § 478.070.

18. This Court has personal jurisdiction over Defendants, because the fraudulent conduct was committed in this judicial district; Plaintiffs are Missouri residents who were injured by Plaintiffs' conduct while in Missouri; and Defendants operate and regularly market to consumers in this judicial district.

19. This Court has authority over this action pursuant to § 407.100, RSMo, of the Missouri Merchandising Practices Act ("MMPA"), which allows an aggrieved consumer to bring a civil action and allows for class relief.

20. This Court has subject matter jurisdiction because Plaintiff asserts claims that arise under Federal law, and there is complete diversity as required by 28 U.S.C. §1332.

21. Defendant has submitted to Jurisdiction and Venue within this state, because it is a supplier who, in person or through an agent or instrumentality, engaged in the subject consumer transactions at issue within this State, and specifically within Johnson County, Kansas. *See* KS 50-638.

## GENERAL ALLEGATIONS

### A. THE KCPA

22. The Kansas Consumer Protection Act ("KCPA"), Ch 50-623, provides that, "[t]his act shall be construed liberally to promote the following policies: (a) To simplify, clarify and modernize the law governing consumer transactions; (b) to protect consumers from suppliers who commit deceptive and unconscionable practices; (c) to protect consumers from unbargained for warranty disclaimers; and (d) to provide consumers with a three-day cancellation period for door-to-door sales."

23. The KCPA defines "consumer" as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes."

24. Plaintiff is a consumer under the KCPA.

25. The KCPA defines "consumer transaction" as, "a sale, lease, assignment or other disposition for value of property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with respect to any of these dispositions. "Consumer transaction" does not include the disposition of repossessed collateral by any supplier that is subject to and compliant with any state or federal law or rules and regulations with regard to disposition of such repossessed collateral."

26. The KCPA defines "person" as, "any individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative or other legal entity."

27. The KCPA defines "supplier" as, "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."

28. Defendant is a "person" and "supplier" within the meaning of the KCPA.

29. The KCPA provides as follows:

> **Deceptive acts and practices.** (a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.
>
> (b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:
>
> ***
>
> (2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;
>
> (3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;
>
> ***
>
> (7) making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions, or the price in comparison to prices of competitors or one's own price at a past or future time..
>
> ***
>
> (12) falsely stating, knowingly or with reason to know, the reasons for offering or supplying property or services at sale or discount prices.

(emphasis added)

30. Defendant has violated (at least) the aforementioned (2), (3), (7), and (12) in the KCPA. The KCPA also provides as follows with respect to "unconscionable acts and practices":

> **50-627. Unconscionable acts and practices.** (a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction. (b) The unconscionability of an act or practice is a question for the court…"

31. The KCPA allows injured and aggrieved persons, such as the Plaintiff here, to recover their damages and penalties.

**B. THE MMPA**

32. § 407.020, RSMo., provides in pertinent part: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.... Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement, or solicitation.

33. "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation - 4 - trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010.5, RSMo.

34. "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." § 407.010.4, RSMo. 12. "Sale" is defined as "any sale, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash or on credit." § 407.010.6, RSMo.

35. Trade" or "commerce" is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms "trade" and "commerce" include any trade or commerce directly or indirectly affecting the people of this state." § 407.010.7, RSMo.

36. Defendants have sold merchandise in trade or commerce within the meaning of § 407.010, RSMo.

37. The Attorney General has promulgated rules explaining and defining terms used in §§ 407.010 to 407.145 of the Merchandising Practices Act. The relevant rules include, but are not limited to, the provisions of 15 CSR 60-8.010 to 15 CSR 60-9.110.

38. An unfair trade practice is any practice which – (A) Either – 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or 2. Is unethical, oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers." 15 C.S.R. 60-8.020.

39. Deception is any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." 15 C.S.R 60-9.020(1).

## C. THE SPECIFIC FRAUDULENT AND UNLAWFUL TRANSACTION AT ISSUE

40. This case concerns a complex fraudulent scheme. Laird Noller, who requires every customer to purchase add-on service or other packages in order to make its profit, used $17,000 in un-disclosed and non-approved add-ons to increase the stated value of a vehicle, in order to finance the vehicle for almost $30,000 more than its sales price. Laird Noller, with the assistance of the other Defendants, did this through forgery, wire fraud, and mail fraud. And, upon information and belief, Defendants systematically engage in this unlawful conduct on an ongoing basis.

41. As of January 1, 2026, Plaintiffs owned a 2025 BMW X7 with negative equity. The vehicle had been a demo vehicle. The list price was $114,000, and Plaintiffs paid approximately $87,000 for the vehicle and financed $115,000 through the BMW dealership in Columbia, MO.

42. Plaintiffs wished to purchase a new, less expensive vehicle, but they were concerned about the ability to do so given the negative equity in their X7. Plaintiffs wanted to lower their monthly payment.

43. On December 19, 2025, Mr. Thornton texted Fabian Flores[1] at Lard Noller Hyundai in Lawrence and worked out a car deal on a posted 2026 Hyundai Palisade. Laird Noller knew the

[1] Plaintiffs reserve their rights to amend their complaint to add Mr. Flores and other individuals involved in the fraudulent, unlawful scheme at issue.

Thorntons did not have the X7's, and that it was not registered. Laird Noller provided a sheet with the financial breakdown of the deal.

44. On December 20, 2025, Mr. Thornton traveled to Lawrence and took possession fo the Palisade, and the dealer took possession of the X7. Laird Noller put a plate on the Palisade.

45. On December 20, 2025, Mr. Thornton and Laird Noller signed an agreement for the purchase of the Palisade. A true and accurate copy of the sales document is attached hereto as Exhibit 2 and incorporated herein by reference.

46. According to the contract, Plaintiffs were to purchase the Palisade for $56,996, which reflected a $3,884 discount from the window sticker. Plaintiffs were to pay $999 in Document fees, and $5.00 in government fees. Plaintiffs' were given a $92,000 trade in allowance (on a car they purchase a year earlier for $74,000), leaving an amount of $81,000 to be financed. Plaintiffs did not agree to purchase any add-on service packages.

47. According to CarFax, on December 21, 2025, Laird Noller listed the X7 for sale.

48. Plaintiffs then requested the title for the X7, which Plaintiffs ultimately received.

49. On December 31, 2025, according to CarFax, the X7 was serviced with nitrogen added to the tires, the oil and filters changed, and the tires rotated.

50. On January 8, 2026, Mr. Thornton obtained the registration for the X7.

51. On January 16, 2026, a new sales representative, "Matt," texted Mr. Thornton, asking him if he could visit the office the following day to complete necessary paperwork.

52. On January 17, 2025, Plaintiffs arrived at Laird Noller Hyundai around 10:30am. They signed the paperwork to trade in the X7 for the Palisade. Plaintiffs did not agree to or signed any digital contracts. Plaintiffs signed a KS-553 document; Plaintiffs left with original 553 document that had not been signed by Laird Noller. Laird Noller installed a 60 day tag on the Palisade for us.

53. Laird Noller did not tell Plaintiffs, in form or substance, that they were purchasing any service packages. Laird Noller, by and through its representatives, told the Thorntons to sign the document, which was necessary to get the needed financing.

54. On January 17, 2026, Laird Noller presented a "Buyer's Order" to the Thorntons and told them to sign the document, which needed to be signed to complete the deal.

55. Plaintiffs glanced at the document before signing, but had no choice but to sign, given that they had now driven the Palisade for almost a month.

56. A true and accurate copy of the Buyer's Order is attached hereto as Exhibit 3 and incorporated herein.

57. A review of the Buyer's Order is truly interesting. While the sticker price for the vehicle was approximately $61k, the vehicle price was inflated to $69,996. Again the negotiated sales price was approximately $56k.

58. The BMW X7, which was listed on December 21, 2025 (when Laird Noller did not have the title), and then sold by Laird Noller Hyundai to Laird Noller Ford. A true and accurate copy of the X7's Carfax report is attached hereto as Exhibit 4 and incorporated by reference herein.

59. On December 31, 2025, Laird Noller Hyundai performed extensive service on the X7, despite not possessing title.

60. The Buyer's Order identifies "Aftermarket" of $12,400, it but does not state what that "aftermarket" was for. At no point did Laird Noller tell the Thorntons that they were purchasing any service packages or add-ons. At no point did the Thorntons

61. Given the inflated price of the vehicle from the contracted price and the additional "aftermarket", along with the $115,000 price Laird Noller Hyundai gave to the X7 (that Plaintiffs paid $74,000 for the prior year).

62. The title for the Palisade is dated January 17, 2026, and it identifies the lien date as January 17, 2026.

63. At no point after January 17, 2026, did Plaintiffs sign any additional documents, and at no point did Plaintiffs sign any agreements for add-on packages.

64. Unbeknownst to Plaintiffs, on January 17, 2026, Laird Noller forged Mr. Thornton's signature on a several, undisclosed add-ons. True and accurate copies of those documents, which Plaintiffs did not learn about until May 12, 2026, when Mr. Thornton received a letter from Ethos flagging the legitimacy of a $7,300 service package.

65. On May 12, 2026, the Thorntons received a letter from the ethos group saying an add-on contract had been denied. Mr. Thornton called and was told the letter was for a $1,100 window tint film package. Mr. Thornton learned that Laird Noller had also purchased (on his behalf) an interior/exterior coating for approximately $600; Gap insurance for $1,500, and a nitro tire package for $7,300, which was denied, because the prices was so ridiculously high. All of these contracts were forged; Plaintiffs did not sign them and did not know that they were being purchased in Plaintiffs' names. Theses items were not identified on the KS-553 form that the Thorntons signed on January 17, 2026.

66. After receiving a letter from Ethos on May 12, 2026, a true and accurate copy of which is attached hereto as <u>Exhibit 5</u> and incorporated herein by reference, Mr. Thornton contacted Ethos and learned that about the forged add-on agreement, which total more than $17,000. True and accurate copies of the forged agreements for undisclosed and unwanted add-ons is attached hereto as <u>Exhibit 6</u> and incorporate by reference herein.

67. The following is a chart showing the various add-ons that Laird Noller added to make the financing work; Plaintiff had no idea that they were paying for $17,000 in add-on packages so that Defendants could inflate the value of the Palisades to make the financing appear kosher:

| **Product** | **"Date of Purchase"** | **Price** |
|---|---|---|

| | | |
|---|---|---|
| Windshield Protection Product Guaranty | 01/17/2026 | $1,100 |
| Nitrogen Protection Plan | 01/17/2026 | $7,300 |
| GAP Waiver Addendum | 01/17/2026 | $1,500 |
| Interior/Exterior Protection | 01/17/2026 | $6,000 |
| Maintenance Plan | 01/17/2026 | $0.00 |
| Window Film Protection Plan | 01/17/2026 | $1,100 |
| | **Total:** | **$17,000** |

68. In what world would Plaintiffs need "Window Protection Product Guaranty" and "Window Film Protection Plan"? And, it certainly appears "coincidental" that the packages (that Plaintiffs have never used and didn't know that they had purchased) where the exact same price!

69. On May 28,2026, Mr. Thornton emailed Laird Noller, asking for copies of the documentation from his purchase of the Palisade. The dealer sent over a January 17, 2026 KS-553.

70. Shortly thereafter, Mr. Thornton began reviewing documents and other files. On May 30, 2026, Mr. Thornton went into the Ally financial application and saw that Ally only possessed a January 20, 2026 KS-553. The amount on the top of the second page of the January 20, 2026 KS-553 and noticed that multiple changes had been made from the Januiary 17, 2026, KS-553 that Plaintiffs had signed. Laird Noller added a windshield repair package for $1,100 (that doesn't even exist in Ethos' system). Both Mr. and Mrs. Thornton were at work on January 20, 2026, and they did not sign any KS-553 on January 20, 2026, or otherwise after January 17, 2026.

71. Only from his Ally application did Mr. Thornton then learn that Ally was provided a forged, January 20, 2026, 553-KS-ARB-e 1/25. A true and accurate copy of that forged 553 document is attached hereto as <u>Exhibit 7</u> and incorporated herein by reference.

72. In the forged 553 document, Laird Noller identifies the sales price as $81,296. The 553 signed by the Thorntons on January 17, 2026, identified the sales price as $82,396. This

change was not disclosed to Plaintiffs, and the sale price is artificially inflated using undisclosed add-ons (where Laird Noller forged Mr. Thornton's signature). In addition, they added in and $1,100 windshield repair to get the financed amount to its desired $83,600.

73. Upon information and belief Ally directed Laird Noller to add in another contract in order to justify the financed price. Again, the sticker price of the car was $60k, and the December 20, 2025, sales price was 56k!

74. We know that this is blatant credit fraud, because at no point did Defendants contact the Thorntons and provide them an opportunity to include the add-ons (e.g., window tint). Not only were the add-ons never put on the Palisade, Plaintiffs were not even made aware of them until after May 12, 2026, when they were contacted by

75. On January 20, 2026, Ms. Thornton was at work all day. She was did not sign the forged 553 document and could not have done so. Attached as Exhibit 8 and incorporated by reference.

76. Upon information and belief, Ally was the party that actually created the January 20, 2026, forged 553 document, although Laird Noller knew that Ally was manipulating the price to maximize the loan amount.

77. On June 1, 2026, Mr. Thornton contacted Laird Noller and spoke with Will Enyard, identified as the general manager. Mr. Enyard pulled up the subject transaction file and reviewed it; Mr. Enyard kept saying it was "ass backwards," and he had no idea why they did the transaction that way it was done. Mr. Enyard proceeded to tell Mr. Thornton how Laird Noller had engaged in bank fraud, and that Ally was not only a knowing participant, but encouraged the conduct.

78. On June 2, 2026, Mr. Thornton send materials from the transaction to Ally Bank. Ally Bank has not responded.

79. Mr. Thornton has the Kansas notice of security interest. The original only has Mr. Thornton's signature; Mrs. Thornton did not sign the document. The copy that the dealership sent Mr. Thornton has neither other their signatures on the security page.

80. During pre-litigation discussions, Defendants' attorney, Cody Phillips, told Mr. Thornton

81. The January 20, 2026, document, which was forged and not disclosed to Plaintiffs, is therefore not an enforceable or valid contract, including its referenced arbitration provision. However, Plaintiffs have been making inflated monthly payments.

82. Plaintiffs had viewed an online posting for a new, 2026 Hyundai Palisade HEV on Laird Noller's website and also on cars.com, and they were specifically motivated to purchase the subject vehicle based on those postings, which did not state, in form or substance, that a consumer was required to purchase a service plan or anything other than the vehicle.

83. After testing driving the vehicle, Plaintiffs then went inside to negotiate with their sales representative, Fabian Flores.

84. The Palisade's sticker price was $60,880. A true and accurate copy of the vehicle's sticker is attached hereto as <u>Exhibit 9</u> and incorporated by reference herein.

85. On May 12, 2026, Mr. Thornton received a letter from Ethos Group. A true and accurate copy of the letter is attached as <u>Exhibit 5</u> and incorporated by reference herein. In the letter, Ethos notified the Thorntons that, with respect to the Thorntons' "Nitrogen Protection Product #5017180002," Ethos was "unable to accept your application for coverage due to the following reason(s): We have requested but have been unable to obtain missing or revised service contract application information from the dealership."

86. Plaintiffs had not purchased such add-on package and were not even aware of its existence until receiving this letter.

87. Mr. Thornton has reported the subject conduct to several agencies. They have uniformly recognized that improper conduct has occurred, but have not taken any further actions other than telling the Thorntons to accept Laird Noller's offer to refund $14,400 (e.g., the amount of the forged third-party plans).

88. However, doing so will not fully cure the harm the Thornton's have suffered.

89. And, more importantly, requiring Laird Noller to pay such a paultry amount will not solve the fact that Defendants engage in this unlawful and ongoing conduct on an ongoing basis.

90. A true and accurate copy of the response letter from the Kansas Attorney General is attached as Exhibit 10 and incorporated by reference herein.

91. A true and accurate copy of the response letter from the Kansas Department of Revenue is attached as Exhibit 11 and incorporated by reference herein.

92. There are ethical ways Laird could encourage buyers to purchase the add-on.

93. Other, ethical dealers disclose their required add-ons in their advertised pricing, making it clear that the price is part of the actual price. The following is an example of a dealer that requires window-tinting to be included:




94. Plaintiffs are not the only people to be victimized by Defendants.

95. As noted above, there is a pending lawsuit for deceptive practice, fraud and RICO pending in the United State District Court for Kansas.

96. As noted above, Laird Noller was one of less than 100 dealers to receive a warning letter from the FTC this past March.

97. The following appears on the Better Business Bureau website:

> **Review fromKathy W**
> **Date:** 06/17/2025
> 1 star
> RUDE, they only cared about the "other" sales items Like their Advantage package,etc. They really talk about that "bird poop protection" and "nitrogen filled tire" $1999 package.. (BTW - you don't have to buy, it is not "already on the car") small print or not…

98. Upon information and belief, Laird sold the Dealership to McCarthy in, or around, Aprile 2026. Upon information and belief, the sale was a direct result of the FTC warning letter, and McCarthy knew it was paying less than market because its purchase was assisting in the concealment of the fraudulent scheme.

99. Plaintiffs have attempted to research the nature of the sale. However, because both Defendants are private, Plaintiff has not been able to determine the structure of the transaction, although it appears that McCarthy purchased the dealership at a "fire sale" price to allow Laird Noller to remove itself from the legal issues it was facing. As such, McCarthy is a knowing and intentional participant in the unlawful enterprise.

100. Plaintiff also asserts claims against McCarthy under the legal theory of "successor liability," as it continues to operate the dealership as it was under the ownership of Laird.

101. The doctrine of successor liability is an equitable doctrine. *See Ramsy v. Adams,* 603 P.2d 1025 (Kan. 1979) (corporate veil pierced "when equity demands"). Under Kansas law, the application of an equitable doctrine rests within the sound discretion of the district court. *See Consolver v. Hotze,* 395 P.3d 405 (Kan. 2017).

102. Where assets are sold, the general rule is that liability does not likewise transfer to the purchaser.

103. However, Kansas recognizes four exceptions to that general rule: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the corporations; (3) the purchasing corporation is merely a continuation of the selling corporation; and (4) the transaction is entered into fraudulently in order to escape liability for the seller's debts.

104. In addition to successor liability, McCarthy is also a knowing participant in the ongoing unlawful conduct at issue in this Action. When Laird Noller received the FTC warning letter, McCarthy purchased the subject Hyundai at a "fire sale" price, knowing that the sale would be part of Defendants' concealment efforts.

105. Defendants corporate Defendants, along with their participating employees and representatives constitute an enterprise associated in fact.

106. In addition, Plaintiff will add the subject providers of the required service packages and other unlawful add-ons, as well as the sales representatives engaging in the unlawful conduct.

107. While the subject dealerships are marketed a legitimate car dealership; they are, in fact, fronts for ongoing unlawful conduct.

108. Upon information and belief, Laird does not earn its profits from the sales of its used cars, but rather the required add-ons, including service packages such as the one Plaintiffs and others were required to purchase. And, in Plaintiffs case, without even knowing that they were doing so by and through forged documentation.

109. As such, when Laird was exposed by the FTC and the practice came to light, Laird sold the subject dealership.

110. Plaintiffs were harmed and injured as a direct and proximate result of Defendant's ongoing unlawful conduct. Specifically, unknown to them, they purchased more than $14,000 in add-on packages.

111. Before filing this Action, Plaintiffs sent this Petition to the registered agents for both Defendants and attempted to resolve the matter without the need for litigation. They were not successful. With respect to the specific warranty that Plaintiffs were required to purchase, they are each entitled to several statutory damages for several instances of deceptive conduct.

112. Defendants' counsel responded by offering to refund the $14,400 in unlawful add-ons. That is the same approach Defendants, by and through the same counsel, responded to the demand letter sent in the pending Kansas action.

113. Defendants must be punished in a wholistic manner that punishes them appropriately and ensures that this conduct stops immediately.

114. Laird Noller is evil and takes advantage of consumers in both Missouri and Kansas (and elsewhere).

115. As noted above, in response to Plaintiffs' request for assistance, Ally claimed no wrong-doing and directed Plaintiffs to work directly with Laird Noller.

116. In sum, Plaintiffs have received no assistance, other than being told to take a refund of the amounts purchased by Laird Noller on Plaintiffs' behalf through unlawful, forged documents.

117. That simply is not enough.

118. Ally, Ethos and McCarthy are knowing participants in the unlawful conduct at issue here and, upon information and belief, the ongoing and systematic conduct by Laird Noller with other customers. Ally Bank certainly has the ability to determine that the value of the Palisade is far less than $83k. Ethos certainly knows that Plaintiffs and other customers do not use or even register for the add-on products that they supposedly "knowingly" purchased. And McCarthy is there to pay "fire sale" prices for dealerships, such as Laird Noller, who need to sell when called to task.

119. In fact, Laird Noller's manager at the time of the events at issue had a telephone conversation with Mr. Thornton, wherein he stated that the subject banks, including Ally, want the dealerships to artificially inflate the price of the loans issued. Mr. Thornton recorded that conversation, which will be played to the jury in this Action.

## CLASS ALLEGATIONS

120. The MMPA authorizes Plaintiffs to bring this suit as a class action because Defendant's alleged unlawful conduct has "caused similar injury to numerous other persons." Mo. Rev. Stat. § 407.025.2. 21.

121. Plaintiffs bring this class action for violation of the MMPA pursuant to Mo. R. Civ. P. 52.08 and Section § 407.025 on behalf of all residents of Missouri who have been forced to purchase a an add-on package with a vehicle during the period of applicable statute of limitations and who were citizens of the State Missouri on the date this Class Action Petition was filed (the "Class"). Such limitation period is five years.

122. Such class shall be comprised to two subclasses: (1) those who knowingly were forced to purchase add-ons, and (2) those who were not aware that they had purchased add-ons.

123. Excluded from the Class are (1) Defendant, its subsidiaries and affiliates, and its directors and officers and members of their immediate families; (2) federal, state, and local governmental entities; and (3) any judicial officers presiding over this action, their judicial staff, and members of their immediate families. Also excluded from the class is Plaintiffs' attorney, who is the plaintiff in a pending action against Defendants McCarthy and Laird Noller.

124. Members of the Class are so numerous that their individual joinder herein is impracticable.

125. Common questions of law and fact exist for all class members.

126. The MMPA claims of Plaintiffs and the Class arise from a common nucleus of operative facts including questions regarding: (1) whether members were illegally treated by

knowingly or unknowingly being forced to purchase an add-on package with a vehicle purchased from Laird Noller.

127. Plaintiff's MMPA claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's unlawful conduct. It's pretty simple: a consumer attempts to purchase a vehicle at a stated price, the consumer should not be required (knowingly or not) to purchase add-on packages.

128. Plaintiffs have no intertest that is antagonistic to the interests of other class members.

129. Plaintiffs and all members of the Class have sustained similar economic injury arising out of the alleged unlawful conduct for which Laird Noller is liable.

130. Plaintiffs are fair and adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs have retained competent and experienced counsel, who are fair and adequate representatives of the proposed Class because they will vigorously prosecute this action and do not have any conflicts of interest with the Class. The interests of Class members will be fairly and adequately protected in this lawsuit by Plaintiffs and their counsel.

131. Common issues predominate over individual issues in this case because the overriding issues of liability and damages under the MMPA can be determined on a class-wide basis from common evidence regarding Defendant's uniform misconduct and the uniform economic harm to class members.

132. In fact, the letters received by Plaintiffs demonstrate why class treatment is so important. Laird Nollers's response when called to task is to simply offer a refund of the offending amount. This, however, does not punish Laird Noller or force it to stop. And, the amounts at issue for each individual are not large enough to interest most plaintiffs' attorneys.

133. Class treatment is the superior method of adjudicating the class members' MMPA claims because it avoids the inefficiencies and inconsistencies of piecemeal litigation and ensures that all class members are given their day in Court that would not otherwise be possible for such small value claims. Class treatment also is expressly authorized by the MMPA. See Mo. Rev. Stat. § 407.025.2.

134. Before initiating this Action, Plaintiffs contacted Laird Noller and asked it to change its practices and compensate them for effectuating such change. Defendants refused to do so.

## COUNTS

## <u>COUNT I</u><br>VIOLATIONS OF THE KCPA

135. Plaintiffs repeat and re-allege the foregoing paragraph 1 through 134 as if repeated and fully set forth herein.

136. Plaintiffs are persons within the meaning of the KCPA.

137. Laird Noller, Ally Bank and Ethos are suppliers within the meaning of KCPA. E

138. Larid Noller, Ally Bank and Ethos actively and knowingly participated in deceptive and unconscionable conduct within the meaning of the KCPA.

139. Plaintiff was damaged, injured, and aggrieved as a direct and proximate result of the subject Defendants' conduct.

140. The subject Defendants have refused to change its conduct in response to Plaintiffs' demand/request that it do so.

141. McCarthy is liable for Laird's violations of the KCPA as a successor in interest.

142. Ally also has engaged in and participated in deceptive conduct under the KCPA.

143. Ally knowingly and intentionally participated in the deceptive scheme.

144. Upon information and belief, Ally is compensated for underwriting auto loans, and its fee is based upon the amount of the loan.

145. As admitted in the transcribed voice mail, Ally and Laird Noller's other lenders, incentivize dealers to artificially increase the amount of the loan through unwanted add-ons and in other ways, so that the loan may be unlawfully increased.

146. Ethos knowingly participated in the scheme by selling unnecessary and redundant products that is knows customers do not actually register or use.

147. Plaintiff is entitled to receive a civil fine from each of the Defendants in the amount of $20,000 for each instance of deceptive conduct, with such amount totaling millions of dollars.

## COUNT II:
## VIOLATIONS OF THE MMPA

148. Plaintiffs repeat and re-allege the foregoing paragraph 1 through 147 as if repeated and fully set forth herein.

149. This Count is brought as against Laird Noller.

150. Plaintiff brings this MMPA claim individually and on behalf of the members of the proposed Class, all of whom purchased vehicles from Laird Noller.

151. Laird Nollers' vehicles are "merchandise" under the MMPA, which is defined to include "any objects, wares, goods, [or] commodities." Mo Rev. Stat. § 407.010(4).

152. At all times during the class period, Laird Noller has made false, deceptive and misleading representations about the ingredients in the products.

153. Laird Noller's unlawful marketing of its vehicles has been, and continues to be, conducted through a uniform advertising campaign consisting of website content, on-product claims, social media marketing and other similar publications.

154. Laird Noller's representation on its website, cars.com and elsewhere are deceptive and fraudulent, because the prices do not include add-ons that consumers are required to purchase.

155. Laird Noller's representation of the prices of its vehicles is unlawful under the MMPA because they are false and misleading. *See* Mo. Code Regs. Ann. tit. 15, § 60-7.030(1).

156. Lard Noller's representations of the prices of its vehicles are unlawful under the MMPA because Defendant does not have a reasonable basis for making performance claims with respect to the prices of the products. *See* Mo. Code Regs. Ann. tit. 15, § 60-7.040(1).

157. Laird Noller's representations of the prices of its vehicles constitute unfair practices under the MMPA because they offend public policy, are unethical and unscrupulous, and present a risk of substantial injury to consumers.

158. Laird Noller's representations of the prices of its vehicles constitute unfair practices under the MMPA because it is unconscionable for Defendant to make false, deceptive and misleading claims about the prices. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.080(1). 37.

159. Laird Noller's representations of the prices of its vehicles are deceptive under the MMPA because they have the tendency or capacity to mislead, deceive and cheat consumers into believing that the products are lower priced than they are. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.020(1).

160. Laird Noller's representations of the prices of its vehicles are deceptive under the MMPA because they tend to create a false impression of the products as costing less than they actually do. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.020(1).

161. Laird Noller's representations of the prices of its vehicles are unlawful under the MMPA because they employ deceptive format in the description of the products. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.030(1).

162. Laird Noller's representations of the prices of its vehicles are fraudulent under the MMPA because they use falsehoods, deception, trickery and breach of trust to cause financial injury to consumers and gain an undue and unconscionable advantage over consumers in the selection and purchase of its vehicles. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.040(1).

163. Laird Noller's representations of the prices of its vehicles are unlawful under the MMPA because they use false pretense by means of trickery, deception, and false or fraudulent

representation or pretense to defraud consumers in the purchase of the falsely, deceptively and misleadingly represented products. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.050(1).

164. Laird Noller's representations of the prices of its vehicles constitute unlawful misrepresentations under the MMPA because they make assertions about the prices of the products that are not in accord with the actual facts. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.070(1).

165. Defendant's representations of the prices of its vehicles constitute unlawful misrepresentations under the MMPA because they contain material untruths about the actual prices of its vehicles. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.080(1).

166. Laird Noller's representations of the prices of its vehicles constitute unlawful misrepresentations under the MMPA because they use half-truths to the prices of the products while omitting material facts necessary to make the representations not misleading. *See* Mo. Code Regs. Ann. tit. 15, § 60- 9.090(1).

167. Laird Noller's representations of the prices of its vehicles constitute fraudulent misrepresentations under the MMPA because they make claims about the price of the products that Defendants know are not in accord with the facts and/or that Defendant knows do not have a reasonable basis. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.100(1).

168. Laird Noller's representations of the prices of its vehicles are unlawful under the MMPA because they conceal material facts from consumers regarding the lack of Vitamin C. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.100(1).

169. Defendant's representations of the prices of its vehicles are unlawful under the MMPA because they suppress material facts by curtailing and reducing the ability of consumers to know the actual price of vehicles. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.100(2).

170. Defendant's representations of the prices of its vehicles are unlawful under the MMPA because they omit material facts by failing to disclose to consumers that they are not accurate. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.100(3)

171. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the members of the Class have suffered an ascertainable loss of money under the benefit of the bargain rule by paying for add-ons they did not actually want to purchase. All class members are entitled to be refunded amounts paid for unwanted add-ons.

172. This constitutes a uniform, objective measure of damages for each class member, determined at the time of purchase without regard to any individualized consideration of transactional motivation or subsequent use of the product. Damages for each consumer are measured as the amount paid for unwanted and/or unknown add-ons..

173. Plaintiff and the Class are entitled to punitive damages because Defendant's conduct involves a high degree of moral culpability and was wanton, outrageous and/or made with reckless disregard to the consequences to Plaintiffs and the members of the Class.

## COUNT III:
## COMMON LAW FRAUD

174. Plaintiff repeats and re-alleges the foregoing paragraph 1 through 173 as if repeated and fully set forth herein.

175. This claim is brought against Laird Noller and McCarthy.

176. Laird Noller intentionally made false statements of fact to Plaintiffs.

177. Specifically, Laird represented that the cost of the vehicle and amount financed would be the amounts reflected on the December 20, 2025, contract that Plaintiffs signed when they took possession of the Palisade.

178. In fact, Laird Noller intended to manipulate and change those amounts as necessary to maximize the amount financed through Ally.

179. In fact, Laird Noller intended to do so by adding add-ons through forgery that were not authorized by, or disclosed to, Plaintiffs.

180. Laird Noller did, in fact, forge documents to include financed add-ons that Plaintiffs were not made aware of by Laird Noller as part of the purchase process.

181. Plaintiffs relied upon Laird Noller's statements (and failure to disclose) to their detriment.

182. Plaintiffs were, in fact, deceived by Laird Noller's intentional conduct.

183. McCarthy is liable for Laird Noller's fraud as a corporate successor in interest.

184. Plaintiffs were damaged and injured as a result of the intentional fraud.

## <u>COUNT III</u>
## CIVIL RICO, 18 U.S.C. § 1962(a), 1962(b), and 1962(c)

185. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 184 and the exhibits attached hereto, as if fully set forth herein.

186. This Count is asserted against all Defendants, and it will be asserted against the individual employees that perpetrated the subject unlawful conduct.

187. The United States Supreme Court long ago held that, while the principal purpose of RICO was to combat organized crime, the act is not so limited.

188. "RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct." *Robert L. Kroenlein Trust ex rel Alden v. Kirchhefer,* 764 F.3d 1268, 1274 (10th Cir. 2014); 18 U.S.C. 1964(c) (providing private right of action and treble damages for § 1962(c) violations).

189. That is exactly what happened here.

190. Plaintiffs (like every other person purchasing a vehicle from Defendants) was required to purchase unwanted service packages that they have never used and had no intention of doing so. That is economic harm incurred as a part of the enterprise's ongoing unlawful conduct.

191. So, for example, if the corner deli is really a front (potentially to launder money) for an illegal casino in the back of the house, then the subject operation is a RICO enterprise (should it be operated for a sufficient period of time with threat of continuity).

192. The same is true here with respect to Defendants. Laird Noller appears to be operating viable car dealerships throughout Kansas. However, the dealerships are a front. In fact, for years, Laird has used its dealerships as a front for ongoing, illegal conduct. And, upon information and belief, Laird's dealerships are not profitable without the illegal conduct, which is, in part, why the subject dealership was sold less than a month after the FTC warning letter was received.

193. Ally and Ethos are knowing participants in the ongoing unlawful scheme. They receive and send wires and mails to perpetrate the fraud. Ally knows and benefits directly from Laird Noller's intentional inflation of prices above their actual market by using add-ons to maximize the amount of loans. Ethos knowingly benefits from the payment (often through financing) for add-ons that it know customers do not registered for and/or actually use.

194. Specifically, as acknowledged by the FTC through its March 2026 letter, Laird Noller's pattern of practice throughout its Kansas network of dealership of requiring the purchase of an add-on service package and/or other items is illegal.

195. The dealership is a front for the far more profitable service packages that Laird's consumers have been, and continue to be, required to purchase in order to obtain a vehicle.

196. Thus, Plaintiffs and the hundreds (if not thousands) of victims unwittingly attempt to purchase a vehicle, but instead were all unwittingly converted to customers of service warranties. That is unlawful. With respect to Plaintiffs, they did not even know that they had purchased the subject add-ons.

197. The offensive conduct is required throughout Laird's extensive network of dealerships that specifically advertise to and target citizens of Missouri. It has been ongoing for several years and, without the Court's intervention, will continue into the future.

198. \At all relevant times, Plaintiffs were and are "persons" within the meaning of RICO, Title 18 United States Code Sections 1961(3) and 1964(c), and each of the Defendants

were/are Participants and are "persons" within the meaning of RICO, Title 19 United States Code Sections 1961(3) and 1962(c). 326.

199. The Participants comprise of Defendants who, along with their sales representatives and service package providers were tasked with requiring the sale of service packages was, and is, an enterprise in association and fact. Each and every Participant profited from the unlawful scheme.

200. At all times relevant to this Complaint, the Participants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities or individuals associated in fact, which were engaged in, and the activities of which affected, interstate commerce and foreign commerce for unlawful purposes.

201. The function, purpose and goal of the unlawful enterprise was to illegally require to sale of undisclosed service packages and other add-ons as a requirement to purchase used vehicles, as well as mismanagement of the business, which function, purpose, and goal was obtained through repeated, intentional felonious acts identified within 18 U.S.C. § 1961 and otherwise.

202. The enterprise was created in or about February1984 when Laird was formed and, upon information and belief, first began using its dealerships as a front to sell highly-profitable service packages and other undisclosed add-ons.

203. The enterprise is an association-in-fact enterprise, with an unlawful purpose (*e.g.*, to require, yet conceal the requirement that all used vehicles be sold with a service package and/or other required add-ons); a relationship among those associated with the enterprise (explained supra); and a longevity over a period of years, allowing the Participants to pursue and carry out the enterprise's purpose.

204. RICO broadly defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although

not a legal entity 18 U.S.C. §1961(4). Plaintiff relies on the latter part of this definition namely that Laird Noller, McCarthy, and their respective representatives formed an association-in-fact enterprise. *See Boyle v. United States*, 556 U.S. 938, 946 (2009) (explaining that an association-in-fact enterprise has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose"). Here, the purpose among the participants was to mask an ongoing fraudulent and illegal scheme behind the front of a legitimate business and to conceal such conduct from public scrutiny.

205. Laird Noller (through their various dealerships) and McCarthy and the providers of the unlawful add-ons and financing, all joined together to form and conduct the affairs of the association in fact enterprise at issue (including third-party vendors of the subject service packages—whose identities and full involvement will not be known until discovery has been conducted) to implement and execute a scheme to fraudulently require all customers to purchase not only an advertised vehicle at its advertised price, but also undisclosed service packages and related items. *See, e.g., In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492 (recognizing that "corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity"). *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262–64 (2d Cir. 1995) (concluding that individual defendant and his two corporations in distinct lines of business were necessarily distinct from each other as well as from the alleged association-in-fact enterprise).

206. Upon information and belief, in 1984 or at some time thereafter, the management of Laird Noller directed its sales representatives and various entities and dealers that, in addition to their legitimate task of selling used vehicles, they were also required (illegally) to require customers to purchase undisclosed and unwanted service packages and other undisclosed add-ons.

207. Upon information and belief, Laird Noller is not profitable without implementing the illegal conduct at issue. That is why the subject dealership was sold to McCarthy less than a month after Laird received the FTC warning letter.

208. Following the enterprise's creation in February 1984 or thereafter, the Participants concealed their illegal requirements to purchase add-ons and not accurately advertise the cost of used vehicles for several years, through the repeated use of unlawful acts including, inter alia, mail fraud, wire fraud, falsification of business records, and perjury.

209. By the through the posting of the subject cars.com listings and analogous listings on its own website, including the ones that Plaintiffs observed in 2025, are instances of wire fraud, where Participants have illegally used the wires to perpetrate their fraud.

210. The Participants also engaged in wire fraud when they sent the subject documentation to effectuate fraud upon Plaintiffs. Ally Bank engaged in wire fraud when it sent the letter attached hereto as Exhibit 9, wherein it attempted to conceal its knowing involvement in the fraudulent transaction involving Plaintiffs.

211. Laird Noller uses the mails and wires on an ongoing basis to perpetrate the fraud. At any given time, Laird has, literally, hundreds of fraudulent postings on its website and on cars.com. In every instance, the wires are illegally used to post listings and the Participants know are fraudulent, because they fail to identify that a purchaser is required to purchase an expensive service package and/or other undisclosed (and high profitable) required add-ons.

212. With respect to Plaintiffs, Mr. Thornton viewed the fraudulent listing for the vehicle at issue in December 2025, on both Laird Noller's website and also on cars.com. Laird Noller engaged in wire fraud when it communicated with Mr. Thornton before he traveled from Missouri to Kansas on December 20, 2025. The required add-on was not disclosed in the posts or telephone communications, meaning they were instance of wire fraud that traveled across state lines.

213. Each and every time Laird Noller has posted used vehicles during the applicable statute of limitations period, Defendants have engaged in wire fraud. Plaintiffs were harmed and injured by virtue of viewing all of the postings (hundreds) and then also by virtue of the economic injury from having to purchase $17,000 in unwanted (and undislosed) add-ons.

214. Rule 9(b)'s purpose is "to afford [a] defendant fair notice" of a plaintiff's claims and the factual grounds supporting those claims. *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir. 1997). In determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control. *See, e.g., Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1221, 1323 (7th Cir. 1998) ("Rule 9(b) is relaxed upon a showing" that plaintiff is unable to obtain essential information in defendant's possession without pretrial discovery); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997) (explaining that Rule 9(b)'s "normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control" but that "even under a relaxed application of Rule 9(b) .... [p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible"); *Scheidt v. Klein*, 965 F.2d 963, 967 (10th Cir. 1992) ("Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief.").

215. Plaintiffs were victims of the enterprise when he observed the initial fraudulent listings; when he was then required to purchase as service package; and thereafter, including the hundreds of other Laird postings of used vehicles he has now observed.

216. It does not matter that Plaintiffs' principal victimization related to a single purchase and the relating listing views and test drive. Plaintiffs need only be victimized once by an illegal enterprise to possess standing to sue under civil RICO. The instance of injury is separate and apart

from an ongoing, illegal enterprise that gave rise to such injury. Plaintiffs have, in fact, incurred actual economic injury as a result of the unlawful enterprise and scheme.

217. Participants have intentionally taken steps for the purpose of concealing their own malfeasance, including the failure to disclose required services packages and other items on Laird Noller's websites and Cars.com.

218. At all relevant times, Defendants engaged in "racketeering activity" within the meaning of Title 18 United States Code § 1961(1), by engaging in two or more of the acts set forth above and/or described below within a ten-year period. The acts set forth above and/or those identified herein below constitute a violation of one or more of the following statutes: Title 18 United States Code Section 1341 (mail fraud) and Title 18 United States Code Section 1343 (wire fraud).

219. At any given time, Defendants have, literally, hundreds of fraudulent and illegal postings of used vehicles that do not identify the correct price or disclose required add-ons. It is o egregious that Defendants were one of less than 100 dealerships nationally to receive a warning letter from the FTC this past March.

220. 18 U.S.C. §1961(1)(B) defines "racketeering activity" to include indictable acts of mail and wire fraud as prohibited under 18 U.S.C. §§ 1341 and 1343, respectively. To establish a pattern of racketeering activity, Plaintiff must allege at least two predicate acts. *See* 18 U.S.C. §1961(5) (requiring at least two predicate acts to establish "pattern of racketeering activity"); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 838 (10th Cir. 2005). Plaintiff has pled subject wire fraud with particularity, including the use of the wires in the two postings (cars.com and Laird Noller's website), which he viewed in the days immediately prior to Saturday, November 1, 2025. Indeed, every single listing that Laird Noller had for used vehicles (hundreds) was an instance of wire fraud, as Defendants used the wires to publish and disseminate listings that were fraudulent and failed to disclose required add-ons.

221. The fraudulent scheme to engage in and conceal unlawful and otherwise fraudulent conduct through the use of ongoing unlawful means began in or around February 1984 and continues to this day.

222. In connection with Defendant's scheme, the acts of racketeering activity have occurred after the effective date of the RICO statutes, 18 U.S.C. § 1961, *et seq*., and on numerous occasions over a substantial time period of approximately eight years and within ten years of each other.

223. Defendants' conduct has involved and continues to pose a threat of long-term criminality. As a direct and proximate result of the scheme, Plaintiffs have incurred injury within the United States.

224. The pattern of racketeering engaged in by the Participants involved the previously alleged and related illegal schemes, including repeated mail fraud carried out from February 1984 to the present, and directed at and otherwise affecting Plaintiffs, among others. Such pattern of racketeering includes, *inter alia*, in the knowing creation and issuance of fraudulent financial statements to State and Federal agencies using the mails and wires, including the postings viewed by Mr. Thornton in December 2025.

225. Each transmission described above was, on information and belief, in furtherance of the fraudulent scheme or to conceal or otherwise hide the scheme, and had the same or similar purpose, results, participants, and victims.

226. Upon information and belief, each Participant had specific knowledge that the mails and wires were being utilized in furtherance of the overall purpose of the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used in connection with the furtherance of the scheme.

227. The frequency and number of acts of mail and wire fraud demonstrate that the use of the mail and/or interstate wire communication in violation of 18 U.S.C. §§ 1341 and 1343 was and is an ongoing and continuing pattern and practice of the Enterprise.

228. Defendants list every used car they sell on their website and cars.com; every used vehicle Laird lists is fraudulent, meaning every use of the wires to list is an act of wire fraud in furtherance of the unlawful scheme.

229. The Participants were aware, or had knowledge of, inter alia, the essential nature and scope of the enterprise, and each knowingly intended to and did participate in the enterprise and scheme.

230. Each of the Participants acted with the intent to deprive Plaintiffs of their property and engaged in a scheme or artifice to defraud, as that term is defined in 18 U.S.C. § 1346. 357.

231. The acts alleged are related to each other by virtue of common participants, common victims, common methods of commission, common purpose and common results.

232. As a direct and proximate result of the violation of Title 18 United States Code Sections 1962(a)c, 1962(b), and 1962(c) by the Participants, Plaintiffs have been injured within the United States and have incurred millions of dollars of damages.

233. Plaintiffs suffered an injury to their business or property within the United States within the meaning of 18 U.S.C. § 1964, by the actions of Laird Defendants in violation of 18 U.S.C. § 1962(c).

**COUNT IV**
**RICO CONSPIRACY, 18 U.S.C.**
**§ 1962(d)**

234. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 233 and the exhibits attached hereto, as if fully set forth herein.

235. This Count is asserted against all Defendants.

236. As set forth in Count III, the Participants associated with and comprised an enterprise within the meaning of RICO, Title 18 United States Code Section 1961(4), and conducted or participated, directly or indirectly, in the conduct of the unlawful enterprise's affairs through a pattern of racketeering activity within the meaning of RICO, Title 18 United States Code Section 1961(5), in violation of RICO, Title 18 United States Code Section 1962(c).

237. At all relevant times, each of the Participants was associated with the unlawful enterprise and knowingly agreed and conspired to violate Title 18 United States Code Section 1962(c), by either agreeing to the commission of numerous predicate acts of mail/wire fraud or other felonious acts, as described above, or agreeing to the enterprise's overall objective of fraudulently hiding and concealing the known unlawful and fraudulent sales conduct, in violation of 18 U.S.C. §1962(c)

238. Plaintiffs have been injured within the United States by the actions of the Participants as a direct and proximate result of the RICO violations described above by, *inter alia*, buy being forced to purchase an undisclosed service package, thus constituting an actual, economic injury to Plaintiffs' person or property within the meaning of 18 U.S.C. §1964

239. Plaintiffs are entitled to damages in an amount to be determined at trial. Plaintiffs are also entitled to treble damages, and their attorneys' fees and costs to bring this action pursuant to Title 18 United States Code Section 1964(c).

**<u>COUNT V</u>**
**BREACH OF CONTRACT**

240. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 239 and the exhibits attached hereto, as if fully set forth herein.

241. A contract existed between Plaintiffs and Laird Noller Automotive, Inc. This Count is brought as against that Defendant, only.

242. That contact was signed on December 20, 2026.

243. The contract is valid and enforceable. In the alternative, the document signed on January 17, 2026 is a valid and enforceable contract that has been breached by Laird Noller.

244. Plaintiffs fully discharged all obligations pursuant to the contract, and any failure to do so was excused by Defendant's conduct.

245. Plaintiffs were injured and damaged as a direct result of Defendant's breach of contract.

## COUNT VI
## BREACHES OF FIDICUARY DUTIES

246. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 245 and the exhibits attached hereto, as if fully set forth herein. This count is brought against Ally Bank.

247. Plaintiffs own shares of Ally Financial, the parent company that controls Ally Bank.

248. Ally Bank and its officers, directors and management owe fiduciary duties of care and loyalty to Plaintiffs.

249. Upon information and belief, as admitted by Laird Noller's manager in a recorded telephone call with Mr. Thornton, Ally Bank knows and encourage dealers to increase the value of vehicles above their actual value for purposes of unlawfully increasing the amount financed.

250. This illegal conduct is a violation of loyalty by those knowingly involved and care for any that are not knowing participants within Ally Financial.

251. Ally Bank has breached its fiduciary duties of loyalty and perhaps care by engaging in ongoing credit fraud.

252. Plaintiffs were injured and damaged in a unique manner unlike any others. Specifically, the combination of undisclosed and unapproved add-ons is unique to Plaintiffs and specifically established to inflate their loan and "make the transaction work' for the benefit of all Defendants.

253. Plaintiffs are entitled to actual damages and punitive damages in an amount to be determined by the jury at trial.

## COUNT VII
## CREDIT FRAUD (TRUTH IN LENDING ACT)

254. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 253 and the exhibits attached hereto, as if fully set forth herein.

255. Plaintiffs intended to purchase a vehicle and to do so on the terms agreed upon on December 20, 2025.

256. On January 17, 2026, Laird Noller presented documentation to Plaintiffs, which they signed. Unbeknownst to Plaintiffs, Laird Noller had changed the terms

257. Thereafter, Laird Noller, with the knowledge of remaining Defendants, forged documentation to include undisclosed add-ons.

258. Laird Noller did so with the specific intent of increasing the vehicle's stated value and the principal balance of the loan extended to Plaintiffs to amount far in excess of the Palisade's actual value.

259. Defendants each benefited from this unlawful and improper conduct.

260. Plaintiffs have been injured and damaged as a direct and proximate result of Defendants' conduct.

## COUNT VIII
## TORTIOUS INTERFERENCE

261. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 260 and the exhibits attached hereto, as if fully set forth herein.

262. A valid and enforceable contract existed between Laird Noller and Plaintiffs.

263. The remaining Defendants were aware of that December 20, 2025, contract and the subsequent document signed on January 17, 2026.

264. The remaining Defendants intentionally interfered with the contract(s) between Laird Noller and Plaintiffs, and they did so for their financial benefits.

265. Plaintiffs were damaged and injured as a direct and proximate result of Defendants' unlawful conduct.

## RESERVATION OF RIGHTS

41. Plaintiffs expressly reserve their rights to amend his Complaint to seek punitive damages at the appropriate time in this Action.

## JURY DEMAND

Plaintiffs demand a jury trial for any and all matter that may lawfully be submitted to a jury.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows as against the Defendants jointly and severally:

1. Finding that Defendants violated the KCPA;
2. Finding that Defendants violated the MMPA,
3. Awarding civil penalties and/or damages as against Defendant for each violation of the KCPA and MMPA;
4. Awarding Plaintiffs their actual damages;
5. Awarding Plaintiffs treble damages;
6. Awarding Plaintiffs punitive and exemplary damages;
7. Awarding Plaintiffs their legal fees and costs related to this Action pursuant to the KCPA, MMPA, and Civil RICO and conspiracy to violate Civil RICO;
8. Awarding Plaintiffs pre and post-judgment interest;

9. Awarding preliminary and permanent injunctive relief preventing Defendants from engaging in the fraudulent conduct identified herein.

10. Any such other and further relief as the Court deems equitable and just under the circumstances.

Dated: September 8, 2026

Respectfully submitted,

**BLATNICK LAW LLC**
*/s/ Samuel L. Blatnick*
Samuel L. Blatnick
Att. # 27122
15732 Oakmont Street
Overland Park, KS 66221
slb@blatnicklaw.com
Advocacy-Integritty-Results™

**VERIFICATION**

Jarett Thornton, an adult of sound mind, do swear under the penalty of perjury that the aforementioned is true and accurate to best of my knowledge and understanding.

Dated: September 9, 2026

[signature]